Thank you, Your Honor. May it please the Court, my name is Gerald Giordano. I represent the plaintiff-appellant in the Hughes case. My client is Joel Hughes, who was a prisoner in the Arizona Department of Corrections from about the early 90s until 2011. During most of that time, he had hepatitis A, I'm sorry, hepatitis B and C. This is a case which is brought under the Eighth Amendment for essentially failure to treat. The standard is deliberate indifference to an inmate's serious medical needs. This is — It seems that they treated him quite a lot. They might not have treated him fabulously or well or even — it may have been negligently, but they certainly treated him a lot. There was a — there were a number of actions taken, Your Honor. I — there's a difficult question here, frankly, that's presented as to what is it more than mere medical negligence is required to reach this deliberate indifference standard. It is a difficult question. The district court did not have the benefit of a case decided by this Court. I think it was — it was very shortly after the district court's decision was handed down. That case was Snow v. McDaniel, which was decided in 2012. Now — Which has been somewhat undermined by a very recent opinion. I was going to — about to mention that, Your Honor, that last week, I believe, an en banc panel of this Court in a case called Peralta v. Dillard. The decision was handed down on March 6th. The decision doesn't yet have a number, but it is a — I believe it's going to be a published opinion. It overruled Snow in part, but it only overruled Snow on an issue that, frankly, was never presented in this case. The question in Peralta was whether — I think we know that. Okay. Thank you. Lack of resources. There's no lack of resources issue here. Correct. Or at least it hasn't been litigated, frankly. If you ruin my client's favor on the appeal and we go back, we may well have to litigate that issue, but it hasn't been raised at this point. What the Snow court said, and it didn't make any new law, but it did a beautiful job of describing the state of the law in this circuit. It said, Obviously, more than an ordinary lack of due care is required. The state of mind for deliberate indifference is subjective recklessness. But then it said something that seems to — that comes back from that a little bit. And here's the quote. It says, But the standard is less stringent in cases involving a prisoner's medical needs, because State responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns. Later in the same paragraph, the Snow court said, We need not defer to judgment of prison doctors and administrators. In the next paragraph, the Snow court said, A prisoner need not prove that he was completely denied medical care in order to prevail. So, frankly, Your Honor, as a litigator, this was a difficult standard for me to figure out what we were needing to prove. But Snow and most of the other cases are instances in which there was essentially a recommendation that the person be referred to a specialist or for some — in this instance, Snow, I think, was in operation, right? Correct. Snow was at Hamilton. Repeatedly, that he needed this operation. And it was never done. Yes. What's the parallel here? The parallel here, and it's discussed a little later in Snow and also in a case called Hamilton. Here's what the Snow court said about Hamilton. As in Hamilton, The circumstances here raise an inference that the defendants were unreasonably relying on their own non-specialized conclusions with deliberate indifference to Snow's medical needs. That's the situation we have here. My client's problem, we contend, is that he was never referred to a liver specialist, a hepatologist, okay, until 2008, many, many years after the first doctor at issue, Dr. Makabuhe, saw him. Dr. Makabuhe saw him in 2002. Should have referred him to a hepatologist immediately. Now, it was medical, I presented evidence, medical, you know, the opinion of a physician, Dr. Feldman, that that was malpractice. It's not the standard. Correct. But it's part of the standard. And then the question is, what more than malpractice is necessary? Well, Dr. Makabuhe saw him from June 12th, 2002, until October 2002, and he identified or at least took the action of ordering more liver function studies. He did. My position is that on September 25th, he should have immediately referred him to a specialist? Absolutely. Okay. That's exactly what was required. And it's a serious medical need, Your Honor. And why is that deliberate indifference? When he then, when he did make, let's say he made a misjudgment about that, but then he did get lab results and detected the early signs of cirrhosis. And then he relied on a recent assessment that didn't, you know, he decided from that no further action was necessary. Well, what he decided was to schedule a follow-up in six months, which never happened. He dropped the ball. He claims it wasn't his fault that he dropped the ball, but the fact was he never made the referral to the specialist. And what the Snow case and what the Hamilton case both stand for is the proposition that a non-expert on an issue ought not to be making these kinds of decisions. They ought, you ought to refer him to a hepatologist. The situation in this case is very strange, I submit, Your Honors, because the defendants have submitted no expert opinion that what was done was okay. The only hepatologists involved in the case are the plaintiff's expert, Dr. Katkoff, who says going all the way back to the 90s, he should have been treated. Okay? And the only other hepatologist who's even in the record is Dr. Mance, who was finally seen by my client in late 2008. And what did he do? Exactly what Dr. Katkoff said should have been done all along. He immediately treated him and brought about relief. Okay. Now, the other doctor who's involved on this appeal, as I understand it, is Dr. Hagman, right? Yes, Your Honor. Okay. The other doctor is Dr. Hagman. And the timeline of Dr. Hagman. Well, let me – okay. So you said that Dr. M, I'll call him for now, dropped the ball. He should have, A, as I understand, immediately referred him. B, if he waited for the test, he should have immediately done it as soon as he got the second test, but then he dropped the ball. Well, your client got transferred, so he's now in a different prison. Are you suggesting that Dr. M should have done something with the new institution to say, make sure when he gets there, get him a specialist? Nothing other than he should have made the referral to the specialist, which necessarily would have had my client in care between that point in time. All right. So let me just get back to Hagman, because I want to see how this plays out. So in December 2007, he looks at the chart, orders updated tests. In February, he actually notes the consultation would be necessary. Okay? Correct. So why is that deliberate indifference on his part? He notes in February that a consultation is necessary, but he didn't make the consultation. He should have done it right there. That's a malpractice claim. But what's the deliberate indifference? He said, he said he schedules an appointment the following week to discuss the possible referral. Your Honor, I too struggle to understand what more needs to be proven beyond malpractice to rise to the level of deliberate indifference. Oh, let's take Snow, for example, okay? In Snow, you have a situation in which the treating physician and a specialist were recommending as an emergency this hip operation, and the supervising physician, as I understand it, said no. Yes. So there was we had doctors saying that you need to do this, and it wasn't done. There's nothing similar here, right? There's not a confession by the prison doctors, Your Honor. But again, one of the things that the Snow court said is that you need not defer to the judgment of the prison doctors or administrators. Well, I understand that. But we have doctors who were seeing him when he needed to be seen. They were running tests. They were scheduling follow-ups. And then at some point, what was the total elapsed time between when Dr. M saw him and the about a year and some? From the time the first I understand this goes way back. Correct. But as to the doctor or the defendant's year, what's the total elapsed time? Dr. M first saw him in June of 2002, and last saw him, I believe, in October 2002. So that was four months. I'm sorry. Yes, four months. Right. The problem, though, Your Honor, is there was no referral to a hepatologist. My client had no idea that he needed treatment or that he had a problem, and years went by because they hadn't referred him, nothing was done. And what actually happened is that there was also a set of protocols. Now, the protocols are certainly not a defense if they're inadequate. But on the other hand, they are, I guess because this is so prevalent in prisons, the prison has essentially devoted some expertise to coming up with a treatment scheme. So these doctors, although generalists, were not flying without advice or without a protocol. That is true. There were two different sets of protocols involved. Okay. Your time is up. We'll give you a minute or so in rebuttal. Thank you. Thank you, Your Honor. May it please the Court. My name is Kathy Stewart. I'm an assistant attorney general from Arizona. And I want to speak to some of the questions and issues that have been raised. As you've indicated, Dr. Hageman and Dr. Makabuhe were two physicians who were briefly involved, five years apart, in the management of a chronic hepatitis viral infection. The district court correctly concluded that there was insufficient evidence presented for reasonable jurors to conclude that either one of them was deliberately indifferent and this Court should affirm. More specifically, the Court found that the evidence established that they acted reasonably in accordance with the established guidelines, and these were not. The fact that they were acting in accordance with these guidelines is not a defense in itself. It may demonstrate that they had a little more expertise than a generalist might otherwise have. I mean, it seems to me it's the best that you can do with that. I agree that it is not a defense, but it is highly relevant to the issue of whether a minimally competent professional could proceed and believe that their course of treatment was acceptable. Well, not necessarily. I mean, if the guidelines were designed essentially to save money rather than to treat the – in other words, the question is what's the quality of the guidelines. You'd have to litigate the quality of the guidelines at that point to know whether the following the guidelines was at all relevant. And I would point out, Your Honor, that no evidence has been presented criticizing the guidelines, and they weren't just the prison guidelines. Well, I gather they have been, because the Petitioner's lawyer – I mean, an expert who says that he should have been referred in 1995, it's obviously a question of guidelines, because those guidelines would not have required him to be referred in 1995. Well, and I think it's important to really look at the substance of those declarations as to what they say. They are conclusory statements that the standard of care was immediate referral to a liver specialist for treatment. Clearly, medical experts disagreed at the time. The AMA, as late as 2008, was noting all the ways in which the hepatitis chronic infection is a unique situation. It is different than the kind of injury that we were looking at in the – that this Court looked at in the Snow case. Mainly because it sometimes self-clears, or some of them do. Is that why? Correct. Many are asymptomatic, first of all. It takes decades for it to progress. If it progresses, it is rarely involving serious or fatal complications. There are serious side effects to the available medications, which, of course, we're dealing with two physicians involved five years apart. The education, the medicine, the research, the available medicines have all changed over that point in time. So that's where you look at can you – has what's been presented by experts in this case really presented a factual issue for a jury when there is no distinction made between these two physicians, there is no distinction made between any of the cases of their involvement in Mr. Hughes's care. They're not mentioned by name. There's not anything provided in the way of a date. And if you parse them a little bit further, the general practitioner says standard of care was to send them immediately to a liver specialist as soon as they test positive for hepatitis. Liver specialist says standard of care was review and discuss antiviral therapy with them, and if they consent, offer it to them. At best, they clearly demonstrate a difference of opinion, given what the AMA, the CDC, the NIH, the Federal Bureau of Prisons, and the department's own guidelines, which, again, evolved over time, were indicating that you monitor and assess liver functions until they're persistently elevated, which can only be done over some course of time. And then, as the district court pointed out, like many managed care systems, you conduct a follow-up, you conduct a workup to determine whether the person in your clinical judgment is at a stage where you need input from a liver specialist. And even then, there are contrary indications, and all of the published sources indicate that. So the, again, giving it any credit at all, given how conclusory and ipsedixit the two declarations are. I guess there's a difference between whether there's a contraindication to treatment and whether there's a contraindication to seeing a specialist to determine whether the contraindications supervene the need for treatment. I agree. And more importantly in this case, there is no evidence whatsoever. So in other words, the fact that there are contraindications to treatment isn't really the answer to whether he should have seen a specialist, because when he did see a specialist, I gather there was a determination that those contraindications did not supervene the need for treatment. Actually, that's an interesting point, and not disputed by Mr. Hughes, who didn't file a reply brief. But as indicated in the answering brief, Dr. Monsch, who saw him, the liver specialist, in 2008, indicated that his viral load for the hepatitis D was still so low, he doubted it could be genotyped, which is a precursor to determining whether he's appropriate for antiviral treatment. He did recommend treatment for the hepatitis B. And, of course, Mr. Hughes is out of prison now, but the last we knew is that he had responded favorably to the hepatitis B treatment, that his viral load had been eliminated and the symptoms of the hepatitis B had been resolved. That's undisputed testimony. So it raises a question about harm. The contraindication issue really goes to causation in this case, but we don't even need to get to harm, because there isn't any evidence that there was a conscious disregard of some excessive risk when Dr. Makabuhe and Dr. Hagman chose to proceed in accordance with their own clinical assessment guided by the available treatment protocols in place. And like any managed care system, there have to be some protocols for identifying it. And there's no claim here that he was in pain or debilitated. I mean, to some degree he had symptoms, but that his pain or debilitation itself would have led to, would have triggered a need for immediate or emergency care. Correct. And that's an important point in terms of even when is the mere fact of infection a serious medical need? And I think that is a question that, given the rate of infection in the prisons, is something that may merit discussion. This Court does not need to reach it. I agree with that. As in Bender, they didn't reach it because there was no evidence of deliberate indifference. But it is a serious question as to, given what is undisputed about hepatitis C. Well, presumably it's at the point at which it's going to be a long-term danger to him, or whether it's impeding his ability to recover. Correctly. Almost like this. Not necessarily to die, but to be debilitated in the future if he isn't treated now. Right. If we're talking about an objective threshold for a condition that reaches constitutional proportion, is it appropriate that the serious medical need determination be more tailored to this particular disease and not an injury like the hips of Mr. Snow that were causing obvious debilitation, incredible pain, worse, the conservative treatment they opted to give him actually caused new injury to his kidneys and then narcotic medication and all of its adverse implications as well? So in this case, again, not only is there no evidence to suggest that either of these two doctors were consciously disregarding an excessive risk, there's no evidence that there was any harm as a result of the brief periods of delay that could be possibly attributed to them. No indication that the disease progressed or that the treatment options were affected in any way for the two to three months in Dr. Makabuhe's case where, for reasons he can't account for, he did not return to schedule. And then in 2008, three weeks. And three weeks for another doctor who had been hired to fill the vacancy that Dr. So there isn't any of the kinds of things from which even a remote inference of some sort of deliberate indifference. I think Snow, there was a comment like, don't knock yourself out treating this guy, because there's plenty more where he came from. Not a shred of that kind of evidence in this case. And plenty of evidence that they saw him, that they did tests. If they were wanting to be deliberately indifference and literally not treat him for as long as they wanted to assess and monitor the progress of his disease and determine whether he was at a point where he merited referral to a specialist or consideration of antiviral treatment. Thank you very much. We'll give you one minute in rebuttal, sir. I'll try to be very fast, have a few points to make. First on the Bender case, which the defendants rely on very much. It's an Eighth Circuit case. Interestingly there, the reason that the defendant doctor was not liable was because he did what these doctors didn't. He referred them to a, the patient to a specialist and then relied on the specialist. And for that reason, the Bender court found a lack of deliberate indifference. Two factual issues regarding Dr. Hegman. One major problem, Dr. Hegman found that my client had not even been entered in a database to be tracked by the Hepatitis Committee. But that wasn't his fault. No, that wasn't his fault. It was Dr. McAboohey's fault. How do we know that? That was five years earlier, right? Correct. You should have referred him to a hepatologist and he would have been under treatment. I mean, this is just, I wanted to point out that Dr. Hegman found that. The other issue that is special in this case, another reason why a referral was particularly important, and Dr. Hegman notes this, there was a Hepatitis B and Hepatitis C co-infection. And Dr. Hegman's own notes say that complicated treatment options and is a reason for a referral. Okay? So that's also something Dr. McAboohey missed. On the delay issue, I just want to refer you very quickly in the Peralta case. The Court notes that the prior decisions of this Court have found a three-month delay sufficient to raise the fact that issue on deliberate indifference. That was in the dental care treatment case. But we're talking about delays of years here. You'd ask me specifically about time periods of delay. Well, which years? The years from 2005 to 2007? I think the second doctor didn't delay very much at all, right? Well, the second doctor delayed 10 months. Okay? And he was writing tests and doing things by then, right? No. He said he should do a referral, and then he did nothing else, and the ball got passed off to other people, and ultimately, after 10 months, a referral was finally effected. My point is this Court has said three months is enough to raise an issue of fact. Here I've got at least 10. The final thing I want to raise is we've been talking about differences of opinion. There's no different note. There's no legitimate difference of opinion in the record here about the hepatology opinions. They are not citing a single witness. They're citing some sort of standards. Standards are nice. But if they want to dispute the, you know, proper opinions of experts like my doctor, Dr. Kattoff, they should have brought a doctor in here to dispute it. This is not a difference of opinion. It's a difference. We've got an opinion on my client's side and some standard on their side. Thank you, Your Honor. Thank you very much. The case of Hughes v. Chennail is submitted. We'll go on to United States v. Castro Lopez.
judges: Quist, Fisher, Berzon